IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE SEARCH OF:** | ) | |
| 1) BMW X5 BEARING NY REGISTRATION | ) | Magistrate No. 21-2102 |
| KPB-9199 AND VIN: 5UXKR0C50H0V68328 | ) | |
| | ) | |

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR<br>A SEARCH AND SEIZURE WARRANT BY TELEPHONE<br>OR OTHER RELIABLE ELECTRONIC MEANS</u>

I, Brianna Maria Coleman, having being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I, BRIANNA MARIA COLEMAN, am a Special Agent of Homeland Security Investigations (HSI) Immigration and Customs Enforcement (ICE), United States Department of Homeland Security.  As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States, who is empowered by law to conduct investigations of, and make arrests for, controlled substance offenses enumerated in Title 21, United States Code.

2.      I am currently assigned to the HSI Pittsburgh Office of the Assistant Special Agent in Charge in the Contraband Smuggling Group and have been so employed since June 2010.  As a Special Agent, I am authorized to conduct investigations of alleged violations of Immigration laws and Customs laws, including offenses involving the importation of prohibited items, such as narcotics, under Titles 18, 19, and 21 of the United States Code.  While being trained as a Special Agent of the HSI, your affiant has received basic training at the Federal Law Enforcement Training

Center located in Glynco, Georgia.  Your affiant has participated in a number of narcotics and money laundering investigations, which have resulted in the seizure of illegal drugs and evidence of drug violations, as well as the seizure of assets acquired with drug proceeds.  Your affiant has conducted covert surveillance of suspected drug traffickers on numerous occasions, interviewed numerous individuals involved in the drug trafficking trade, participated in a Title III wiretap investigation, participated in the execution of numerous search and arrest warrants, assisted in the arrest of narcotics traffickers, and assisted in the seizure of controlled substances.  Based upon the above experience, your affiant is familiar with the modus operandi of persons involved in illicit distribution of controlled substances, as well as the terminology used by persons involved in the illicit distribution of controlled substances.  Your affiant is aware that persons involved in the illicit distribution of controlled substances routinely attempt to conceal their identities, as well as the location at which drug transactions take place.

3.      I previously worked for the Pennsylvania Office of Attorney General, Bureau of Consumer Protection, from June 2006 to May 2010.  As a Consumer Protection Agent, I investigated and enforced Pennsylvania Consumer Protection Laws.  In 2006, I received a Bachelor of Arts degree in Government and History from Arcadia University in Glenside, Pennsylvania.

4.      In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies.  In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications, analyzing pen register data, conducting court-

2

authorized wire and oral interception electronic surveillance, and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity.

5.      I am currently participating in the investigation of Denny Paul REYES-ROSARIO and Aneudy CUELLO SANTANA for violations of narcotics trafficking.  During a consensual search of REYES-ROSARIO's BMW SUV on a PSP traffic stop, three kilograms of cocaine were located in the back of the vehicle. Specifically, REYES-ROSARIO and CUELLO SANTANA are engaged in a federal felony offense in violation of federal law, in violation of Title 21, United States Code, Sections 841 and 846.  The facts and information contained in this affidavit are based upon my personal participation in this investigation and information provided by other law enforcement officers with The Pennsylvania State Police (PSP), who are also involved in this investigation.

6.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search of the BMW X5 SUV, bearing New York registration: KPB-9199 and VIN:  5UXKR0C50H0V68328, hereinafter the "**TARGET VEHICLE**," further described in Attachment A, for the items described in Attachment B, which is currently being stored at Magill's Towing, 417 Broadway Blvd, Monroeville, PA 15140.

7.      In a substantial number of vehicle searches executed in connection with the drug investigations in which I, fellow HSI Agents, State Police troopers, and other investigators have been involved, the following kinds of drug-related evidence have typically been recovered from the vehicles of drug-traffickers:

    a.      Controlled substances, such as marijuana, heroin, crack cocaine, powder cocaine, methamphetamine, and synthetic narcotics, such as fentanyl;

3

b.      Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, and vitamin B12;

c.      Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

d.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

e.      Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example: money orders, wire transfers (Western Union), cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals such as gold and silver, and precious gems such as diamonds;

f.      Documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, telephone bills and rental car agreements;

g.      Mobile electronic communication devices, such as cellular telephones and "smart phones", electronic messaging equipment, such as tablets, pagers, telephones answering machines, and their tapes, electronic storage devices, such as GPS devices and portable media players, and other such mobile electronic devices that store data, as well as the content therein;

h.      Firearms and other dangerous weapons; and

8.      Based upon my training and experience, as well as the knowledge and experience of other agents and police officers involved in this investigation, I am aware that it is generally a

4

common practice for drug traffickers to transport their drug inventory and drug-related paraphernalia (as described above) in their vehicles, and sometimes even to store their drug inventory and drug-related paraphernalia in their vehicles.

9.      Based upon my training and experience, I also am aware that it is a generally common practice for traffickers to transport large sums of money in their vehicles, either the proceeds from drug sales or money to be used to purchase controlled substances.

10.     Based upon my training and experience, that drug traffickers commonly have in their possession that is on their person, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. I also am aware that, typically, drug traffickers possess these firearms and other dangerous weapons to protect their profits, supply of drugs, and themselves from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

11.     Further, I am aware that narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Furthermore, I know that the aforementioned books, records, receipts, notes, ledgers, etc. are generally maintained where the traffickers have easy and ready access to them, including in their residences, businesses, and automobiles.

12.     Further, I am aware that persons involved in significant drug trafficking, conceal in their residences, businesses, and automobiles, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities.

13.     Further, I am aware that drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing narcotics and the paraphernalia includes, but is not limited to scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution.

14.     My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this affidavit, arise from the following:

a.     My own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described;

b.     My involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations;

c.     Discussion with other members of HSI and law enforcement officers, both about the facts of this case in particular and about trafficking in general; and

d.     Other intelligence information provided through law enforcement channels.

15.     Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of the TARGET OFFENSES are presently located at the **TARGET VEHICLE**. I have the following additional information from my participation in the instant investigation and from my conversations with other law enforcement officers involved in this investigation.

6

16.     As described below, there is probable cause to conclude that the BMW X5 SUV contains addition evidence that was unknown at the time of the consensual search and may have been missed during the consensual search on September 28, 2021.

**PROBABLE CAUSE**

17.     I am currently participating in the investigation of Denny REYES-ROSARIO and Aneudy CUELLO SANTANA for violations of narcotics trafficking. During a consensual search of REYES-ROSARIO's BMW SUV on a PSP traffic stop, three kilograms of cocaine were located in the back of the vehicle.

18.     On September 28, 2021, PSP Trooper (Tpr.) Ryan Marmol, who is a member of the PSP Bureau of Criminal Investigation, Drug Law Enforcement Division, SHEILD unit, was monitoring eastbound traffic along Interstate 76, also known as the Pennsylvania Turnpike. Interstate 76 is a known smuggling corridor.  While monitoring eastbound traffic, Tpr. Marmol observed a BMW X5 pass his location traveling in the left lane without passing. A rapid assessment of the vehicle was conducted, and the following factors should be addressed and explained. First, Tpr. Marmol is aware that this make and model of vehicle has been, and still is, a common vehicle utilized by criminal organizations to outfit with an aftermarket electronic hidden compartment.  Second, the vehicle did not display a license bracket (dealership advertisement).  Based on his training and experience, these items are removed to avoid the vehicle being identified from a certain geographical area which may lead law enforcement to believe it is coming from a certain high drug/crime area.  Third, a registration query was conducted, and Tpr. Marmol learned the vehicle was registered to a male from Bronx, New York.

7

19.     Tpr. Marmol pulled into the travel lanes from his stationary position.  While following the vehicle, Tpr. Marmol observed a large phone mounted to the vehicle's windshield below the rear-view mirror (windshield obstruction).  At approximately 1046 hours, Tpr. Marmol conducted a traffic stop on a 2017 BMW X5 bearing New York registration KPB9199 for Title 75 – Section 3313- Restrictions on use of limited access highways and Section 4524 – Windshield Obstructions and wipers – Other Obstruction.

20.     Upon exiting the vehicle, Tpr. Marmol approached the driver side of the vehicle and detected the strong odor of a masking agent of some sort.  Tpr. Marmol also observed a tree shaped air freshener hanging near the front passenger side window. Based on his training and experience, Tpr. Marmol knows that masking agents are utilized to disrupt the use of narcotic detection canines.  Tpr. Marmol greeted the occupants of the vehicle and identified himself.  Tpr. Marmol requested the male operator's driver's license.  The male operator provided his driver's license and there was another card directly underneath of it.  When he provided these items, his hand was visibly shaking which was noted to be nervous behavior. The male operator was identified as Denny REYES-ROSARIO of Bronx, NY who is also the registered owner of the BMW.  The card that was beneath the driver's license was a Police Department – City of New York Detectives Endowment Association.  Based on Tpr. Marmol's training and experience, he knows often times that individuals involved in criminal activity will provide these cards to law enforcement when stopped/encountered by police.  The reason for this is to convince law enforcement that there is no criminal activity beyond the traffic violation.

21.     After receiving the documents, Tpr. Marmol requested, Tpr. Marmol asked REYES-ROSARIO to exit the vehicle, which he willingly did without incident.  While walking

from the passenger side front door to the rear of the vehicle, Tpr. Marmol inspected the documents that REYES-ROSARIO provided and noticed the vehicle was registered at one time in Albany, New York and was now registered in Bronx, New York.  This was suspicious to Tpr. Marmol because in his training and experience, Tpr. Marmol knows that criminal organizations are constantly re-registering vehicles to evade law enforcement surveillance, other competitors, or criminals who are simply looking to rob them. Tpr. Marmol met REYES-ROSARIO at the rear of the BMW and explained the traffic infractions to him.  Tpr. Marmol advised him to proceed to the passenger side of his patrol vehicle and entered the patrol vehicle.

22.     Once in the patrol vehicle, Tpr. Marmol asked REYES-ROSARIO how long he has been on the road and he related 45 minutes. REYES-ROSARIO said he was sleeping at his friend's house and he related that his friend's wife passed away. REYES-ROSARIO related that it was three (days) ago and now his friend's family want to have a funeral.  REYES-ROSARIO continued to tell Tpr. Marmol that he arrived in the area at approximately 0300 hours.  It was at this time that Tpr. Marmol believed that criminal activity was afoot, and was going to extend the traffic stop to confirm or deny his suspicions.  Tpr. Marmol immediately recognized this to be a cover story; Tpr. Marmol recognized the travel plans to be implausible, and it was a short turn around trip.  REYES-ROSARIO advised Tpr. Marmol three major components of his travel itinerary without being asked.  Based on Tpr. Marmol's training and experience, he believed this to be a cover/rehearsed story that was fabricated during the trip or prior to departing the originating area.  REYES-ROSARIO wanted to inform Tpr. Marmol of these details to provide a parallel story to the criminal activity he was involved in and so that he did not forget the story. This tactic is deployed so that individuals involved in criminal activity can express the

components of their travel itinerary without being asked to proclaim their legitimacy. Tpr. Marmol believed that the travel itinerary was implausible because Tpr. Marmol did not find it reasonable to drive from Bronx, New York to the Pittsburgh region (5 hours and 46 minutes) to visit your friend at 3 o'clock in the morning. Furthermore, the length of the stay was approximately 7 hours. Based on Tpr. Marmol's training and experience, quick trips are common with individuals involved in smuggling contraband because it limits the amount of time that they could be interdicted by law enforcement. REYES-ROSARIO continued to tell Tpr. Marmol how he feels bad because he's alone and was trying to persuade his friend to get away. Tpr. Marmol asked REYES-ROSARIO if his friend's mother died and he said no his wife. Tpr. Marmol asked how his friend's wife died and he said that she had a terrible problem with a surgery. He went on to say how he feels bad because he has known his friend for a long time. Tpr. Marmol asked REYES-ROSARIO where his friend lived, and he had issues pronouncing "Donora." Tpr. Marmol confirmed that REYES-ROSARIO was traveling from Donora, Pennsylvania. Tpr. Marmol subsequently conducted a criminal history check for REYES-ROSARIO and learned that he had been arrested for Alien Smuggling, Possession to Distribute, Conspiracy to Violate Drug Law, and DUI. After learning this information, Tpr. Marmol asked REYES-ROSARIO if he traveled to this area at 3:00 a.m and he replied "yeah." Tpr. Marmol asked REYES-ROSARIO if he had a valid driver's license and he related that he did. Tpr. Marmol proceeded to enter the traffic stop into the Computer Automated Dispatch System. Tpr. Marmol asked REYES-ROSARIO who was in the vehicle with him and he indicated Aneudy CUELLO SANTANA. Tpr. Marmol confirmed that they were on their return trip to Bronx, NY

and Tpr. Marmol advised REYES-ROSARIO that Tpr. Marmol needed to reapproach the BMW
to obtain the insurance card.

23.    Tpr. Marmol reapproached the BMW and contacted the passenger. Tpr. Marmol
requested the vehicle's insurance card and asked the male passenger where they were coming
from.  The male passenger related that they were coming from Pennsylvania but didn't know
where.  His response was problematic to Tpr. Marmol as a trained interdiction officer.  Tpr.
Marmol found it extremely suspicious that the passenger didn't know where they were traveling
from even though they spent the last twelve (12) hours engaged in this voyage.  Individuals that
are engaged in criminal activity must lie to conceal their criminal activity from law enforcement.
Tpr. Marmol asked the male passenger how long they were in the area and he related since last
night. While the male passenger looked for the vehicle's insurance card, Tpr. Marmol confirmed
that he did not know where they were traveling from in Pennsylvania.  Tpr. Marmol asked the
male passenger what they did while they were in Pennsylvania and he related that he was along
for the ride and that they visited someone whose wife recently died. The male passenger was not
able to locate the vehicles insurance card and Tpr. Marmol broke contact to return to his patrol
vehicle.  Tpr. Marmol identified the male passenger as Aneudy CUELLO SANTANA.  Tpr.
Marmol conducted a criminal history query for CUELLO SANTANA and learned he was
arrested for Criminal Trespass, Possession of Marijuana, Petit Larceny, Criminal Possession of
Stolen Property, Aggravated Unlicensed Operation of Motor Vehicle, DUI, False Personation,
Criminal Possession Weapon.

24.    Ultimately, Tpr. Marmol asked for consent to search the vehicle based on the
indicators of criminal activity.  At 11:00:51, Tpr. Marmol asked REYES-ROSARIO "Can I

search this car?"  REYES-ROSARIO replied, "Yes sir."  Tpr. Marmol asked,  "bumper to

bumper" and REYES-ROSARIO answered in the affirmative.  At 11:01:21, REYES-ROSARIO

signed a Waiver of Rights and Consent to Search.

      25.    At 11:04:10, Tpr. Marmol began the consent search of the vehicle.  At 11:06:10,

Tpr. Marmol located two (2) Bisquick boxes that were saran wrapped inside of a factory storage

compartment in the rear cargo area of the vehicle.  Tpr. Marmol noted that the kilograms were

not elaborately located and could be easily accessed.  After removing the two (2) boxes, Tpr.

Marmol located a yellow grocery bag that contained a kilogram sized package of an unknown

substance. Based on Tpr. Marmol's training and experience, this was consisted with the way

narcotics are packaged for wholesale distribution.

      26.    At 11:07:10, REYES-ROSARIO and CUELLO SANTANA were placed in

handcuffs.

      27.    The Bisquick boxes were opened and found to contain two (2) more kilogram

sized packages.  Tpr. Marmol conducted a TRU NARC analysis was conducted on every

package which yielded a positive presumptive test for Cocaine.  Tpr. Marmol also conducted a

NIK Test was utilized on the package that was in the yellow grocery bag, which yielded a

positive presumptive test for Cocaine.

      28.    At 11:11:19, Tpr. Marmol advised REYES-ROSARIO of his Miranda Rights.

Tpr. Marmol asked him if he understood his right and he replied "yeah."  At 11:11:46, Tpr.

Marmol advised CUELLO SANTANA of his Miranda Rights. Tpr. Marmol asked him if he

understood his rights and he replied "yeah."

29.     At 11:12:35, Tpr. Marmol asked REYES-ROSARIO if he could continue his search of the vehicle and he replied, "yes sir."

30.     A further search of the vehicle revealed two (2) cell phones in the center console: a black flip phone and a smartphone. These phones were found by Tpr. Glenn ADAMS (Bureau of Criminal Investigation – Western SHIELD Unit). CUELLO SANTANA possessed a gold iPhone, and REYES-ROSARIO claimed the iPhone with a red case that was affixed to the windshield. During the traffic stop, Tpr. Marmol observed this iPhone was being utilized as GPS.

31.     On September 28, 2021, your Affiant and fellow agents Michael O'Neill and Cody Schmitt responded to PSP Greensburg barracks to interview REYES-ROSARIO and CUELLO SANTANA regarding the three kilograms of cocaine that was discovered in REYES-ROSARIO's BMW.

32.     Investigators interviewed REYES-ROSARIO, who had previously waived his Miranda Warnings and consented to speak with the agents.  Investigators confirmed that REYES-ROSARIO had been read Miranda Warnings and agreed to speak with investigators. REYES-ROSARIO stated that he lived in the Bronx, NY, and provided investigators with his address.   REYES-ROSARIO said that he was on a road trip to visit his friend "Ramul" in Donora, PA.  He stated that the purpose of the trip was to show support for the death of Ramul's mother, which investigators learned was different than the story he had told Troopers only a short time earlier.  Your Affiant is aware that those involved in criminal activity often have to fabricate a story, so as not to divulge the truth about their illegal activities.  However, the stories, or lies, are not always easily remembered and added with the stress of an arrest, they can be easily forgotten or confused.

33.     REYES-ROSARIO stated that he asked Aneudy CUELLO SANTANA to accompany him for the road trip.  REYES-ROSARIO stated that CUELLO SANTANA was a friend who he has known since high school.  REYES-ROSARIO told agents that CUELLO SANTANA took a car service to REYES-ROSARIO's house between the 7:00 and 10:00 PM on September 27, 2021.  He further stated that the two men drove to Newark, NJ, before ultimately driving to Donora, PA to visit Ramul.  When asked what was in New Jersey, REYES-ROSARIO responded only a friend, but would not elaborate.  Further, throughout the interview, REYES-ROSARIO would put his head down, he took a while to answer questions, and appeared to be under severe stress.  Ultimately, REYES-ROSARIO and CUELLO SANTANA did not tell investigators the same story.

34.     REYES-ROSARIO stated that they arrived at Ramul's house at approximately 3:00 AM on September 28, 2021. He stated that the men woke Ramul and spent several hours with him to pay respect and show support of the passing of Ramul's mother.  REYES-ROSARIO stated that he and CUELLO SANTANA slept on couches briefly, before departing to drive home at 9:00 AM.  None of this made sense to investigators.  REYES-ROSARIO also said that it took some time for Ramul to even wake up when they arrived in the middle of the night, so they stayed in the car.

35.     REYES-ROSARIO stated that the car was pulled over by PSP at approximately 11:00 AM.  He stated that he gave the state troopers consent to search the vehicle and was unaware of the cocaine that was located in the back of the SUV.  However, REYES-ROSARIO also admitted to being previously arrested for a Federal felony, in which he served three years in jail.  When explaining the arrest to investigators, REYES-ROSARIO was nonchalant saying that

14

someone paid him to drive some people.  When your Affiant queried his criminal history, she

saw that he had been changed with alien smuggling.  Based on REYES-ROSARIO's previous

arrests, which could be viewed as acting in a similar capacity, coupled with his behavior during

the interview, the fact that his story did not make sense to investigators and ultimately differed

from that of his travel companion, investigators believe that REYES-ROSARIO is fully

knowledgeable about the cocaine located in his vehicle.

36.     REYES-ROSARIO identified his cell phone, which was located in the vehicle as

his cell phone.  Investigators asked REYES-ROSARIO for consent to search his cell phone,

which he denied.  He also denied knowledge of or ownership of the two cell phones that were

both located in the center console of his vehicle.

37.     REYES-ROSARIO stated that he did not remember Ramul's address or how to

get to his house by memory, and said that he used his cell phone for GPS to travel there and

back.  As noted above, his cell phone was mounted to the dashboard and was being used for GPS

at the time of the traffic stop.  REYES-ROSARIO also refused to disclose the contact's name

that he had Ramul listed in his phone.

38.     Investigators interviewed CUELLO SANTANA.  Investigators confirmed that

CUELLO SANTANA had been read Miranda Warnings and agreed to speak with investigators.

CUELLO SANTANA stated that he lives in Norwalk, CT, and provided his address.  CUELLO

SANTANA told investigators that he knew REYES-ROSARIO from high school.  As

investigators conducted each interview it was apparent what was truthful: that being an easy

recollection of a truthful memory.  It was also apparent what statements were not truthful, but

rehearsed: these needed considerably more thought than a statement that is true and small details would not match up.

39.     CUELLO SANTANA stated that REYES-ROSARIO asked him to accompany him on a trip to PA to visit a friend whose wife died.  CUELLO SANTANA mentioned Pittsburgh, but then when asked if he had seen the skyline, he said that they didn't go to the city, but he didn't know where they had gone.  CUELLO SANTANA stated that he took an Uber from Connecticut to New Jersey, where he met REYES-ROSARIO, at the car rental area of the Newark airport.  CUELLO SANTANA said that REYES-ROSARIO had wanted to rent a vehicle, but something happened, and he didn't.  Your Affiant is aware that those transporting narcotics and narcotics proceeds like to utilize rental vehicles, as they believe that it minimizes their involvement in the trafficking.  These statements were inconsistent with REYES-ROSARIO's statements that CUELLO SANTANA had met REYES-ROSARIO at his house in the Bronx.

40.     CUELLO SANTANA stated that he arrived at Newark airport at approximately 10:00 PM. He stated that his Uber ride to Newark cost $119, which his sister paid.  He stated that REYES-ROSARIO was supposed to pay him the cost of the Uber.  CUELLO SANTANA denied that ROSARIO-REYES was going to pay him anything additional for the trip.  However, like REYES-ROSARIO, their stories and their quick turnaround trip was not consistent with normal traveler patterns.  Additionally, neither CUELLO SANTANA or REYES-ROSARIO brought any bags for their road trip, knowing they would be gone throughout the night.

41.     CUELLO SANTANA stated that they arrived at REYES-ROSARIO's friend's house at approximately 4:00 AM. CUELLO SANTANA was not sure of the friend's name but

thought it was maybe "Ray."  He stated that they talked with and spent several hours with the friend in his living room.  Investigators found it odd that after spending several hours with someone, CUELLO SANTANA did not know his name.  CUELLO SANTANA further stated that he went back out to the car to charge his phone, where he then fell asleep for several hours. He was later awoken by REYES-ROSARIO at approximately 10:00 AM, when he came back to the car and told CUELLO SANTANA that they were leaving.  CUELLO SANTANA stated that they were supposed to stop at a hotel on their drive back, but ROSARIO-REYES decided to make the drive without stopping.  Your Affiant is also aware that quick trips are common with individuals involved in smuggling contraband because it limits the amount of time that they could be interdicted by law enforcement.

42.     CUELLO SANTANA identified his cell phone.  CUELLO SANTANA told investigators that he had nothing to hide and that they could look through his phone.  He consensually gave investigators his password.  After investigators attempted to access his phone with that password several times in front of CUELLO SANTANA and then he even attempted the passcode, it wouldn't work.   CUELLO SANTANA even made a big deal about trying to remember it and telling investigators that had to be the code because it is his mother's birthdate. Investigators asked CUELLO SANTANA if he had changed his passcode during the traffic stop. CUELLO SANTANA admitted that he had tried, but that it didn't work.  Finally, CUELLO SANTANA admitted that was not the correct passcode and he didn't want investigators to look through his phone because he had pictures of marijuana and other private things stored on his cell phone.  Investigators found this elaborate attempt to deceive investigators very significant.

43.     CUELLO SANTANA denied knowledge of the cocaine in the BMW.  He also denied possession of the other two devices located in the center console.

44.     Investigators found CUELLO SANTANA's story that he had spent several hours in the car, outside of someone's house, in the middle of the night, somewhere he didn't know where he was, and also didn't know if anyone had placed anything into the rear of the vehicle, to be far from the true purpose of their quick trip to PA.  Additionally investigators believe that the fact that REYES-ROSARIO and CUELLO SANTANA took such a short trip together, but were unable to provide the same story to investigators about where they started from, where they traveled to, and the reason why they traveled to PA, is indicative of their guilt and their knowledge of this criminal activity.

45.     A criminal history report for REYES-ROSARIO revealed that REYES-ROSARIO is a convicted felon.  REYES-ROSARIO was arrested in February of 2015 for Alien Smuggling.  As admitted to by REYES-ROSARIO, he transported three individuals from the Canadian-United States border into Vermont.  REYES-ROSARIO stated that he was paid to transport the three individuals.  REYES-ROSARIO was convicted in December of 2017. REYES-ROSARIO also has a prior arrest for possession with intent to distribute a controlled substance in 2013. This criminal history of illegally transporting people for money as well as drug trafficking shows a propensity to continue to commit these similar crimes.

46.     On September 28, 2021, both REYES-ROSARIO and CUELLO SANTANA were arrested by the PSP.  Federal charges are currently pending.

47.     Based on training and experience, your Affiant knows that it is common for drug traffickers to utilize multiple cell phones to contact other traffickers, sources of supply, as well as

their customers.  It is also known that some devices are solely used to contact a single member of the organization.

48.    On October 8, 2021, your Affiant applied for and obtained four search warrants for the four cell phones that had been located in the **TARGET VEHICLE,** which were approved by Chief US Magistrate Judge Cynthia R. Eddy at Magistrate Numbers 21-1988 through 21-1991.

49.    Extractions for the two iPhones and the Samsung smart phone were initiated on October 9, 2021.  The extraction for the flip phone was done on October 13, 2021.

50.    On October 18, 2021, your Affiant began reviewing the data from Denny REYES-Rosario's phone download.  The phone is named "Denny."  In the Photos section, there were multiple photos of kilograms of apparent cocaine, and some of the imprints on the kilograms were similar to the imprint on the seized cocaine, making it apparent that REYES Rosario was aware of the contents of his vehicle.  Further, there was a photo that appeared to be of a vehicle panel, with netting.  Located in the photo was a blue-colored cloth or bag with the words, "Oh. Snap!"  This was the area from which the cocaine was seized.  This photo, from his phone, is below.



51.     Tpr. Marmol informed your Affiant that REYES-Rosario has called him a couple times and contacted the barracks several times, all trying in earnest to have his vehicle returned, even after being told it was currently being detained.  Your Affiant is aware that a narcotics detecting canine was not used during the initial search of the **TARGET VEHICLE**, due to the consensual search.  However, Tpr. Marmol thought it very suspicious that REYES-Rosario was calling so often, and began to question whether there could possibly be additional contraband or proceeds of the contraband in the vehicle that was not located during the initial search.

52.     On October 26, 2021, investigators traveled to Magill's Towing, where the vehicle is currently being stored for its possible seizure.  Investigators looked in the back

window of the **TARGET VEHICLE** and observed the same blue bag with the words "Oh.

Snap!"  Further, the same panel with netting was also observed.  See the picture below, taken by

your Affiant, of the vehicle.



53.     Also on October 26, 2021, PSP Trooper Christina Marth and her narcotics

detecting canine Goran were employed to scan the exterior of the vehicle for an odor of a

controlled substance.  Tpr. Marth told your Affiant that canine Goran alerted to the odor of a

controlled substance at approximately 1046 hours.

54.     Additionally, employees of Magill's Towing told investigators that REYES-

Rosario had contacted their office several times, in an attempt to have his vehicle returned.

55.     Based on the above information, your Affiant believes there is evidence of the violations of Title 21 United States Code 841 and 846, being the blue bag with "Oh. Snap!" as well as possible additional contraband and/or proceeds of contraband.

## CONCLUSION

43.     I submit that this affidavit supports probable cause for a warrant to search the **TARGET VEHICLE**, described in Attachment A and seize the items described in Attachment B.

The above information is true and correct to the best of my knowledge, information and belief.

The above information is true and correct to the best of my knowledge, information and belief.

/s/ *Brianna M.  Coleman*
Brianna M. Coleman
Special Agent
Homeland Security Investigations

Sworn and subscribed to before me
this 28th day of October 2021.

_____
Honorable Patricia L. Dodge
United States Magistrate Judge

22

## **ATTACHMENT A**

This affidavit seeks to search a dark-colored BMW X5 SUV bearing New York registration

KPB-9199 and VIN: 5UXKR0C50H0V68328, which is currently being stored at third-party

towing company, Magill's Towing, located at 417 Broadway Blvd., Monroeville, PA 15140.

This vehicle was traffic stopped by the Pennsylvania State Police (PSP) on September 28, 2021,

and was found to be owned and driven by Denny REYES-Rosario, along with passenger,

Aneudy CUELLO Santana, who were both arrested by PSP after three kilograms of cocaine were

located and seized from the vehicle.

## ATTACHMENT B

All evidence in violation of Title 21, United States Code, Sections 841 and 846, including:

1.      A blue bag marked with, "Oh. Snap!"

2.      Controlled substances, to include cocaine, heroin, and all other controlled substances;

3.      Drug paraphernalia, to include narcotics cutting agents, glassine baggies, smoking pipes, grinders, digital scales, decoy can-safes, hydraulic presses, and any other type of device/equipment that can be used to ingest, inject, inhale, consume and/or introduce into the human body any illegal narcotics.  Items that also may be used to manufacture, compound, convert, process, produce, prepare, test, analyze, package, repackage, store, contain, manufacture, cultivate, and/or conceal;

4.      Diluents and adulterants, such as quinine hydrochloride, mannitol, mannite, dextrose, and lactose, used, intended for use or designed for use in cutting a controlled substance;

5.      Cash, currency, Bitcoin and any and all virtual currency, and records relating to controlled substances income and expenditures of money and wealth, such as: money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, stocks, bonds, precious metals such as gold and silver, gems such as diamonds,  as well as records relating to the sale/purchase of automobiles, trucks, etc., to include titles for all vehicles, State of Pennsylvania motor vehicle forms MV-1 and MV-4ST and other related documents, and records relative to insurance for all vehicles;

6.      Any and all evidence, instrumentalities, fruits, and contraband relating to violations of Title 21, United States Code, Sections 841(a)(1) and 846.

24